**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| 3M COMPANY, | : | |
| | : | |
| Plaintiff, | : | Case No.: 2:20-cv-2932 |
| | : | |
| v. | : | Judge _____ |
| | : | |
| PREVENTATIVE WELLNESS | : | **Jury Demand Endorsed Herein** |
| CONSULTANTS LLC, d/b/a | : | |
| PREVENTATIVE WELLNESS | : | |
| SOLUTIONS, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff 3M Company ("3M"), by and through its undersigned attorneys, and for its Complaint against Defendant Preventative Wellness Consultants LLC, d/b/a Preventative Wellness Solutions ("Defendant"), hereby alleges as follows:

### NATURE OF THE ACTION

1.      This lawsuit concerns Defendant's use of 3M's name and famous "3M" trademarks to perpetrate a false and deceptive price-gouging scheme on unwitting consumers, including agencies of government, during the global COVID-19 pandemic.

2.      Throughout its history, 3M has been providing state-of-art, industry-leading scientific and medical products to consumers around the world under its famous 3M marks. Based on this longstanding, continuous use, consumers associate the 3M marks uniquely with 3M. Now, more than ever, consumers are also relying on the famous 3M marks to indicate that the products offered thereunder are of the same superior quality that consumers have come to expect over the past century. This is especially true with respect to 3M's numerous industry-

leading healthcare products and personal protective equipment ("PPE"), including 3M-brand N95 respirators.

3. Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19. To assist in the battle, 3M is working around the clock to supply healthcare workers, first responders, and critical infrastructure operators with millions of 3M-brand respirators. Beginning in January, 3M began increasing its production of 3M-brand respirators, doubling its global output to a rate of 1.1 billion per year, or 100 million per month. This includes 35 million per month being manufactured and distributed in the United States, or more than 1 million respirators per day produced in the U.S. for use in the fight against COVID-19. 3M also is investing in the capital and resources to enable it to double its respirator production capacity once again, to 2 billion globally before the end of 2020. In the United States alone, 3M plans to be producing respirators at a rate of 50 million per month by June 2020, and at a rate of more than 95 million per month by October 2020. And to supplement its U.S. production, 3M also has announced a plan to import 166.5 million 3M-brand respirators from 3M's production facilities overseas. In the United States, 90 percent of 3M's respirators are going to healthcare and public health users, with the remaining deployed to other critical industries such as energy, food and pharmaceuticals. The U.S. distribution of 3M-brand respirators is being coordinated with the Federal Emergency Management Agency, which is basing allocation decisions on the most urgent needs.

4. The demand for 3M-branded respirators has grown exponentially in response to the pandemic, and 3M has committed to meet this demand while keeping its respirators priced fairly. 3M is working with customers, authorized distributors, governments, and medical

officials to direct 3M supplies to where they are needed most. Importantly, 3M has *not* increased the prices that it charges for 3M respirators as a result of the COVID-19 outbreak.

5.      Unfortunately, a number of wrongdoers are seeking to exploit the current public health emergency and prey on innocent parties through a variety of scams involving 3M N95 respirators and other products in high demand.  These scams include unlawful price-gouging, fake offers, counterfeiting, and other unfair and deceptive practices—all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

6.      3M is taking an active role in combating the fraudulent activity, price-gouging, and counterfeiting related to N95 respirator masks that has spiked in the marketplace in response to the pandemic.  3M's is working with law enforcement authorities around the world, including the U.S. Attorney General, state Attorneys General and local authorities to combat price-gouging and other unlawful activities.  3M has established a dedicated point of contact for federal and state procurement officials to promptly validate third-party offers and quotes. In doing so, 3M has already helped prevent dozens of potentially fraudulent transactions with federal agencies, state governments, municipal governments, private enterprises and other organizations. Every U.S. Governor has been briefed on 3M's efforts, and 3M is in regular contact with numerous governors and state attorneys general regarding these efforts to prevent and combat fraud.  The Department of Justice has publicly thanked 3M for the assistance it has provided in investigations that have led to arrests.  *See* Press Release: New Jersey Man Arrested For $45 Million Scheme To Defraud And Price Gouge New York City During COVID-19 Pandemic, available at  https://www.justice.gov/usao-sdny/pr/new-jersey-man-arrested-45-million-scheme-defraud-and-price-gouge-new-york-city-during (May 26, 2020).

7. 3M has also created a website where people can report potential price-gouging and the "3M COVID-19 Fraud hotline" for end-users and purchasers of 3M products in the United States and Canada to call for information to help detect fraud and avoid counterfeit products. Moreover, 3M is publishing information about its anti-price-gouging and counterfeiting efforts on the 3M website, including disclosure of 3M's list prices for its N95 respirators so that customers can identify and avoid inflated prices, and the web address and phone numbers that can be used to identify 3M authorized distributors and dealers in the United States and Canada. Further information about 3M's efforts is set forth in the 3M press release and publication attached hereto as Exhibits 1 and 2, respectively. This Complaint is another part of these efforts.

8. Including this action, 3M has filed over a dozen lawsuits in courts in its fight against fraud, price gouging, and counterfeiting. 3M has won five temporary restraining orders and four preliminary injunction orders from courts across the country that put a stop to other defendants' unlawful and unethical profiteering from the pandemic.

9. Despite 3M's extensive efforts during COVID-19, deplorable pandemic profiteers continue their quests to take advantage of healthcare workers, first responders, and others in a time of need and trade off the fame of the 3M name and trademarks, and falsely associating themselves with 3M and its reputation for providing the highest quality PPE at fair prices. Defendant is a prime example of this unlawful behavior.

10. Through the use of contracts with other suppliers of PPE, Defendant has orchestrated a fraudulent scheme that features: (i) a false affiliation with 3M; (ii) infringement, dilution, and misuse of 3M's valuable trademarks; (iii) various false and deceptive assertions; and (iv) attempted price-gouging of 3M branded PPE products.

11.     In or around March 2020, Defendant contracted with RX2Live, LLC and/or RX2Live, Inc. (collectively referred to herein as "RX2Live") to engage RX2Live as an agent of Defendant in a fraudulent scheme to trade off the fame of the 3M brand and marks, and artificially inflate the price of 3M-brand N95 respirator masks and other medical supplies for sale to healthcare workers, first responders, and others in a time of need.  RX2Live is a franchisor with a nationwide network of franchisees that sell medical supplies, including PPE, to users such as community medical centers and doctor's offices.

12.     A copy of Defendant's form services agreement ("Agreement") with its sales agents is attached hereto as Exhibit 3.  Under the Agreement, the "medical supplies" Defendant and its agents are marketing and selling are defined to include "N95 or 3M compliant masks, gowns, face shields, hand sanitizers, infrared thermometers, etc." (*See* Agreement, Ex. 3.)

13.     Defendant, through its own website and via its sale agents (one of whom is RX2Live) has offered to sell hundreds of thousands of 3M's 3M-brand N95 respirator masks at a grossly inflated price of $4.95 per respirator (approximately 300-400% above 3M's list price).  A copy of Defendant's price list that it used and distributed for use by its agents is attached hereto as Exhibit 4.

14.     Defendant is not an authorized distributor of any of 3M's products and has no right to use 3M's famous 3M marks.  Yet, by using 3M's famous marks and holding itself out as having a relationship with 3M and 3M's products, Defendant confused and deceived consumers in the State of Ohio (and elsewhere) by offering for sale products at unconscionably high prices that were approximately 4-5 times *above* 3M's list prices.  For example, Defendant's price list incorrectly states that it is receiving its inventory of N95 respirator masks directly from 3M, implying that Defendant is a wholesaler or distributor of 3M, which it is not.  (*See* Ex. 4.)  Also,

Defendant states on its website that it has "partnered with many manufacturers around the world to become a direct distributor for many of the sought after PPE supplies including the N95 and 3M masks," implying that Defendant is a partner of 3M, which it is not. (*See* "Home" page of Defendant's Website, attached hereto as Exhibit 5.) These statements and the grossly inflated pricing of masks being offered by Defendant and its agents constitute extreme price-gouging by any measure. Not only does such price-gouging further strain the limited resources available to combat COVID-19, but such conduct justifiably has caused public outrage which threatens imminent and irreparable harm to 3M's brand as Defendant and similar pandemic profiteers promote an improper association between 3M's marks and exploitative pricing behavior.

15. 3M does not – and will not – condone individuals or entities deceptively trading off the fame and goodwill of the 3M name and marks for personal gain. This is particularly true against those who seek to exploit the surge in demand for 3M-brand products during the COVID-19 global pandemic, which already has claimed tens of thousands of lives worldwide and more than 1,603 lives in Ohio alone.

16. Accordingly, to further protect governmental actors and the public from Defendant's fraud and pandemic profiteering, to reduce the amount of time and energy that government officials are forced to waste interacting with such schemes, as well as to forestall any further diminution to 3M's name, reputation, goodwill, and the 3M name and marks, 3M brings this lawsuit against Defendant for federal and state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and deceptive acts and practices. 3M also seeks preliminary and permanent injunctive relief. Any damages, costs, or fees recovered by 3M will be donated to charitable COVID-19 relief efforts.

## THE PARTIES

17.     Plaintiff 3M Company is a Delaware corporation, with a principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144.  3M is a diversified technology company with a global presence and is among the leading manufacturers of products for many of the markets it serves, including PPE such as 3M-brand N95 respirators.

18.     Defendant Preventative Wellness Consultants LLC, d/b/a Preventative Wellness Solutions, Premier Medical Solutions, and/or Healthy Changes Technology is an Ohio limited liability company, with a principal place of business located at 4200 Regent Street, Ste. 200, Columbus,    Ohio    43219.    According    to    Defendant's    website    –    https://preventativewellness.solutions/ ("Defendant's Website") – Defendant is a national healthcare network which consists of independent consultants ranging from LPNs, licensed physicians, medical reps, and other healthcare professionals who are willing to reach out to hospitals, urgent care, government agencies, and physician offices to provide needed tests and PPE supplies.  (*See* Ex. 5.)  The PPE supplies referred to on Defendant's Website includes the 3M-brand N95 respirators at issue in this action, as well as other N95 respirators and surgical masks (what Defendant refers to as "loop masks").

## JURISDICTION AND VENUE

19.     The claims for trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, and false advertising, respectively, asserted in Counts I - IV, infra, arise under the Trademark Act of 1946 (as amended; the "Lanham Act"), namely, 15 U.S.C. §§ 1051 et seq.  Accordingly, this Court has original and subject-matter jurisdiction over Counts I – IV pursuant to 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C § 1121(a).

20.     The claims for deceptive acts and practices, false advertising, trademark infringement asserted in Counts V - VI, *infra*, arise under Ohio statutory and common law, and are so related to the federal claims asserted in Counts I - IV, infra, that they form part of the same case or controversy.  Accordingly, this Court has supplemental jurisdiction over Counts V - IX pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

21.     Defendant has purposefully availed itself of the privilege of transacting business in this District.  Defendant has also committed and intentionally directed tortious acts towards residents and governmental agencies while in this District.  Defendant is an Ohio limited liability company, with its principal place of business located in Columbus, Ohio.

22.     A substantial part of the events giving rise to the claims asserted, infra, occurred in this District.  Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

23.     Defendant is subject to personal jurisdiction in this District.  Therefore, venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### I.     3M

24.     3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of scientific, technical, and marketing innovations throughout the world. Today, 3M's portfolio includes more than 60,000 goods and services, ranging from household and school supplies, to industrial and manufacturing materials, to medical supplies and equipment.

### A.  The 3M Brand

25.     3M offers its vast array of goods and services throughout the world under numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; and more.

Notwithstanding the widespread goodwill and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

26.     The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, and PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and many more.  As a result, 3M-branded products are highly visible in hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand.

**B.  The Famous "3M" Marks**

27.     Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world (including, without limitation, its 3M-brand N95 respirator) under the standard-character mark "3M" and the 3M logo shown below (together, the "3M Marks"):



28.     For decades, products offered under 3M's 3M Marks have enjoyed enormous commercial success (including, without limitation, 3M-brand N95 respirators).  Indeed, in 2019, alone, sales of respirators and related products offered under 3M's 3M Marks exceeded several hundred million USD.

29.     Over the same time period products offered under 3M's 3M Marks have regularly been the subject of widespread, unsolicited media coverage and critical acclaim.

30.     Based on the foregoing, consumers associate the 3M Marks uniquely with 3M and recognize them as identifying 3M as the exclusive source of goods and services offered under the

3M Marks.  Based on the foregoing, the 3M Marks have also become famous among consumers throughout the United States.

31.     To strengthen 3M's common-law rights in and to its famous 3M Marks, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, inter alia, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No. 2,692,036, which covers the 3M logo for, *inter alia*, a "full line of surgical masks, face shields, and respiratory masks for medical purposes" (the "036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, inter alia, respirators (the "'534 Registration"). (*See* Exhibits 6-8, attached hereto.)

32.     Each of the foregoing Registrations is valid, in effect, and on the Principal Trademark Register.

33.     Each of the foregoing Registrations is "incontestable" within the meaning of 15 U.S.C. § 1065.  Accordingly, each Registration constitutes conclusive evidence of: (i) 3M's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) 3M's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.

34.     3M's famous 3M Marks do more than identify 3M as the exclusive source of goods and services offered thereunder. The famous 3M Marks also signify to consumers that 3M-brand products offered under the 3M Marks are of the highest quality and adhere to the strictest quality-control standards. Now, more than ever, consumers rely on the famous 3M Marks' ability to signify that products offered under the 3M Marks are of the same high quality that consumers have come to expect of the 3M brand over the past century.

**C. 3M's Extensive Efforts to Assist With the Battle Against COVID-19**

35.     Medical professionals and first responders throughout the world are donning extensive PPE as they place their health and safety on the line in the battle against COVID-19. As 3M states on the homepage of its website, it is "committed to getting personal protective equipment to healthcare workers":



36.     Among the PPE that 3M is providing to the heroic individuals on the front lines of the battle against COVID-19 are 3M's 3M-brand N95 respirators.

37.     Inset, below, is an image of 3M's 3M-brand, Model 8210 respirator:



38.     Authentic N95 respirators reduce exposure to airborne biological particles and liquid contamination when appropriately selected, fitted, and worn.

39.     Based on the exponential increase in demand for 3M-brand N95 respirators, 3M has invested the necessary capital and resources to double its global annual production of 1.1 billion 3M-brand N95 respirators.  (*See* Exs. 1 & 2.)  **What 3M has not done, though, is increase its prices**.  (*See* id.)

40.     Unfortunately, certain third parties do not share 3M's sense of civic responsibility during this time of crisis. Indeed, opportunistic third parties seek to exploit the increased demand for 3M's 3M-brand N95 respirators by offering to sell them for exorbitant prices, selling counterfeit versions of them, and accepting money for 3M-brand N95 respirators despite not having the product to sell and/or never intending to deliver the product to the unwitting buyer— in many instances, public authorities which struggle to address the enormous financial and logistical challenges presented by COVID-19.

41.     Accordingly, to protect consumers on the front lines of the COVID-19 battle from deception and inferior products, to reduce time wasted by governmental officials on scams, as well as to protect the widespread reputation and goodwill enjoyed by 3M's carefully curated 3M brand, 3M is working diligently with law enforcement, retail partners, and others to combat unethical and unlawful business practices related to 3M-brand N95 respirators.  For example, in late-March 2019, 3M's Chief Executive Officer, Mike Roman, sent a letter to U.S. Attorney General, William Barr, and the President of the National Governor's Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price-gouging.  As shown in the inset image, additional examples of 3M's efforts to combat price-gouging, counterfeiting, and other unlawful conduct during COVID-19 include:

a.     3M posted on its website the list price for its 3M-brand N95 respirators so that consumers can readily identify inflated pricing (*see* Exhibit 9, attached hereto);

b.     3M created a form on its website that consumers can use to report suspected incidents of price-gouging and counterfeiting (*see* Exhibit 10, attached hereto); and

     c.     3M created a fraud "hotline" that consumers can call to report suspect incidents of price-gouging and counterfeiting:



## II.    Defendant's Unlawful Conduct

42.     Despite 3M's extensive measures to combat price-gouging and counterfeiting of its 3M-brand N95 respirators, these illicit activities continue. Defendant is a prime example of this unlawful behavior, which is damaging to the 3M brand and public health.

43.     In furtherance of the scheme summarized above, Defendant uses proprietary pictures of 3M's respirators on Defendant's Website in an effort to misrepresent a relationship with 3M and purport to be an authorized distributor of 3M products. (*See* Ex. 5.)

44.     Defendant's use of and reference to 3M Marks on Defendant's Website and in its Agreements with sales agents is causing consumers and public health officials to mistakenly believe that Defendant is an authorized distributor of 3M's products and/or otherwise had an association or affiliation with 3M and its products. However, Defendant is not, and never has been, an authorized distributor or vendor of 3M's products. Defendant also does not have, and has never had, an association or affiliation with 3M.

45.     But still, on or before March 26, 2020, Defendant's agent RX2Live provided a purchase order form and a price list to its affiliated franchisees. Defendant's agent instructed its

franchisees to submit all orders for products on the price list, including "Face Mask N95 #8210 direct from 3M" to Defendant's agent for handling. (*See* Exhibits 11 & 12, attached hereto.) Defendant, through its agent, authorized, instructed, and urged participation in the scheme detailed herein, sought to orchestrate those activities on a system-wide scale, and mandated the concealment of those activities via its Agreement with sales agents. Defendant implemented the scheme through its sales agents as well as through its website.

46.     For example, on March 27, 2020, Virginia Cooper of RX2Live contacted a prominent healthcare provider on behalf of Defendant, to advertise the availability of PPE products at exorbitant prices. Ms. Cooper provided a spreadsheet listing the availability of "Face Mask N95 #8210 direct from 3M." (*See* Exhibit 11 (excerpted below)).

| ITEM # | DESCRIPTION | MIN. QTY / unit | UNIT PRICE per each piece unless noted |
|--------|-------------|-----------------|-----------------------------------------|
| 00A | Face Mask N95      #8210 direct from 3M | 10,000,000 ea. | $      4.95 |

Personal Protective Equipment Product/Price List 3-26-2020

47.     On March 30, 2020, Ms. Cooper provided the healthcare provider with a PowerPoint presentation containing "pictures, catalog codes, pricing and minimum requirements." (*See* Exhibit 12.)

48.     Defendant's agent's PowerPoint presentation expressly references two models of



3M-brand N95 respirators:  Model 1860 and Model 8210.  The presentation, an excerpt of which is depicted below, prominently displays a photo of a respirator bearing the 3M Mark.  The presentation also represents that the respirators are "Direct from 3M" and that "3M requires payment in full before order can be placed.  Payment is held in escrow until the order is completed."  (Ex. 12, at p. 2.)  None of these statements are true.

49.    The contents of the above-referenced PowerPoint presentation used by Defendant's sales agents are intended to defraud, mislead and/or deceive a reasonable consumer into believing that Defendant and/or its agents are authorized distributors of 3M's products and/or have  an association or affiliation with 3M, which is not the case.  Defendant does not, and never has, represented 3M, and 3M has never authorized Defendant or any other affiliates, agents, employees, or franchisees of Defendant to manufacture, distribute, advertise, market, offer for sale, receive payments on 3M's behalf, escrow funds on 3M's behalf, and/or sell 3M-brand N95 respirators.

50.    The level of specificity in the above-quoted portion of the Formal Quote, including, for example, that any purchase order is subject to 3M's discretionary approval, that 3M allegedly ships its products CIF, and that 3M will determine the production site for the order, are all false and likely to mislead and/or deceive a reasonable consumer into believing that Defendant and/or its agents are authorized distributor of 3M products and/or has an association or affiliation with 3M.

51.    Another equally detestable element of Defendant's unlawful conduct is price-gouging. Defendant's quote of $4.95 per 3M brand respirator is approximately 300-400% above 3M's list price).  (*See* Ex. 4.)  The mere association of 3M's valuable brand with such shameless

price-gouging harms the brand, not to mention is a serious threat to public health agencies that are under economic strain in the midst of a worldwide pandemic.

52.     On April 10, 2020, 3M filed suit against Defendant's agent, RX2Live, in the United States District Court for the Eastern District of California, Case No. 1:20-at-00263 (E.D. Cal.) (hereinafter referred to as the "RX2Live Litigation"), alleging trademark infringement, trademark dilution, unfair competition, price-gouging, and false advertising under the Lanham Act and California's Business and Professions Code.

53.     On April 27, 2020, 3M filed a Motion for a Temporary Restraining Order and Preliminary Injunction against Defendant's agent, RX2Live, seeking to temporarily restrain and preliminarily enjoin RX2Live from using the 3M Marks for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation 3M-brand N95 respirators.  (RX2Live Litigation, Dkt. No. 14-1.)  On April 30, 2020, the District Court granted 3M's Motion and extended the TRO against RX2Live.  (*Id.*, Dkt. No. 18.)  On May 8, 2020, the District Court converted the TRO into a preliminary injunction in a stipulated order.  (*Id.*, Dkt. No. 23.)  As a consequence, RX2Live is barred from "falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products."  (*Id.*, ¶ 1.)  A similar injunction is warranted here given Defendant's role as the ringleader of the unlawful scheme.

54.     During the course of discovery in preparation for a hearing on 3M's Motion for TRO and PI, RX2Live identified Defendant as the company that led RX2Live into believing that Defendant had a direct connection to 3M that Defendant could supply millions of 3M branded N95 respirators, and that 3M wanted resellers to solicit advance payment of orders from customers to be placed in escrow because "3M requires payment in full before order can be

placed." All of Defendant's representations were false. Based on Defendant's false representations, RX2Live offered to sell 3M branded N95 respirators to its customers using marketing materials that Defendant provided touting N95 respirators as "Direct from 3M." Worse yet, RX2Live marketed the 3M branded respirators at exorbitant prices set forth in pricing materials that Defendant provided to RX2Live, also falsely touting a direct affiliation with 3M.

55. Recognizing that its actions were wrong, Defendant undertook extreme measures to cover up the entire fraudulent scheme through the use of an unusual "Non-Circumvention, Non-Disclosure and Working Agreement," which provided in part:.

> "'The Parties' irrevocably agree that they shall not disclose or otherwise reveal directly or indirectly to a third party any confidential information especially proof of funds or proof of product video provided by one party to the other or otherwise acquired, also included are contract terms, product information or manufacturing processes, prices, fees, financial agreement, schedules and information concerning the identity of the sellers, producers, buyers, lenders, borrowers, brokers, distributors, refiners, manufacturers, technology owners, or their representative and specifically individuals names, addresses, principals, or telex/fax/telephone numbers, references product or technology information and/or other information advised by one party(s) to be one another as being confidential or privileged without prior specific written consent of the party(s) providing such information."

As is clear from the attestation provision, the secrecy agreement originated from Defendant:

56.     Based on the foregoing, 3M seeks relief against Defendant for federal and state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, false advertising, and deceptive acts and business practices.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(Trademark Infringement Under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1))*
*(Infringement of the Federally Registered 3M Marks)*

57.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 - 56 of the Complaint as though set forth fully herein.

58.     3M is the exclusive owner of each of the federally registered 3M Marks.

59.     3M has the exclusive right to use each of the 3M Marks in United States commerce for, *inter alia*, advertising, promoting, offering for sale, and selling 3M's 3M-brand N95 respirators.

60.     3M's exclusive rights in and to each of the 3M Marks predate any rights that Defendant could establish in and to any mark that consists of "3M" in whole and/or in part.

61.     Each of the 3M Marks are fanciful and/or arbitrary when used for respirators and, therefore, are inherently distinctive.

62.     Each of the 3M Marks identify 3M as the exclusive source of products offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators) and, therefore, the 3M Marks have acquired distinctiveness.

63.     Defendant is using the 3M Marks in commerce to advertise, promote, offer for sale, and sell 3M-branded N95 respirators, including, for example, on its website by listing the products that Defendant purportedly has available for sale.

64.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendant is 3M, and/or whether Defendant is a licensee, authorized distributor, and/or affiliate of 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

65.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue cause, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products are affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

66.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products originate with, and/or are sponsored or approved by, and/or offered under a license from, 3M.

67.     3M has not consented to the use of its famous 3M Marks by Defendant.

68.     Based on 3M's longstanding and continuous use of its 3M Marks in United States commerce, as well as the federal registration of the 3M Marks, Defendant had actual and constructive knowledge of 3M's superior rights in and to the 3M Marks when Defendant began using the 3M Marks as part its bad-faith scheme to confuse and deceive consumers, as alleged, herein.

69.     Upon information and belief, Defendant adopted and used the 3M Marks in furtherance of Defendant's willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

70.     Upon information and belief, Defendant has made, and will continue to make, substantial profits and gain from its unauthorized use of the 3M Marks, to which Defendant is not entitled at law or in equity.

71.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark infringement in violation of 15 U.S.C. § 1114(a).

72.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct invites public criticism of 3M and the manner in which 3M's N95 respirators are being distributed and sold during the COVID-19 pandemic, and is likely to cause confusion about 3M's role in the marketplace for respirators that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms 3M's brand.

73.     3M has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

*(Unfair Competition, False Endorsement, False Association, and False Designation of Origin*
*Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A))*
*(Use of the 3M Marks)*

74.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 - 73 of the Complaint as set forth fully herein.

75.     Defendant's acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

76.     Defendant's use of 3M's famous 3M Marks to advertise, market, offer for sale, and/or sell purported 3M-brand N95 respirators to consumers at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

77.     Defendants also falsely represented themselves as affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators. Defendants sought to create the false impression that the products they purported to offer to healthcare workers and others originate from, and/or are sponsored or approved by, and/or offered under a license from, 3M.

78.     Defendant has also falsely held itself out to be an agent of and/or authorized by 3M to sell and/or distribute 3M-branded products, when this is not the case.

79.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

**80.**     3M has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

*(Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c))*
*(Dilution of the Famous 3M Marks)*

81.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 80 of the Complaint as though set forth fully herein.

82.     The 3M Marks are famous and have been famous at all times relevant to this action. The 3M Marks were famous before and at the time Defendant began using the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators).

83.     Defendant's use of 3M's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that famous 3M Marks' established selling power and value will be whittled away.

84.     Defendant's use of 3M's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that famous 3M Marks' ability to identify 3M as the exclusive source of products offered under the 3M Marks (including, without limitation, 3M's 3M-brand N95 respirators) will be whittled away.

85.     Defendant's use of 3M's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, is likely to dilute the reputation of the famous

3M Marks, such that famous 3M Marks' established ability to indicate the superior quality of Products offered under such Marks (including, without limitation, 3M's 3M-brand N95 respirators), will be whittled away.

86.     Defendants' misconduct also threatens to harm the reputation of the 3M Marks, constituting dilution by tarnishment of the famous 3M Marks.

87.     Defendant's acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

88.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and is likely to cause confusion about 3M's role in the marketplace for respirators that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms 3M's brand.

89.     3M has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

*(False Advertising Under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B))*
*(Defendant's Website, Sales Agreement, and Agent's Activities)*

90.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 - 89 of the Complaint as though set forth fully herein.

91.   Count IV is a claim for false and deceptive advertising under 15 U.S.C. § 1125(a)(1)(B).

92.   The statements that Defendant makes on its Website, in its Sales Agreement, and through its sales agents constitute commercial advertising and/or commercial promotion.

93.   The statements that Defendant's agents made in pursuing sales of 3M-brand products contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or origin of Defendant and/or the products that Defendant allegedly had available for sale.

94.   The statements that Defendant's agents made and the PowerPoint presentation and pricing list provided to potential customers contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of 3M and the 3M-brand products, including, without limitation, 3M's branded N95 respirators, and constitute commercial advertising and/or commercial promotion.

95.   The false, misleading, and/or deceptive statements of Defendant and its agents were material to consumer's purchasing decisions.  Defendant placed its false, misleading, and/or deceptive statements into interstate commerce through, *inter alia*, Defendant's website and via the use of sales agents such as RX2Live.

96.   Defendant's statements and conduct have directly and/or proximately caused and/or are likely to cause 3M to suffer irreparable diminution to the 3M brand and 3M Marks' reputation, fame, and goodwill.

97.   Defendant's acts and conduct complained of herein constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

98.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and is likely to cause confusion about 3M's role in the marketplace for masks that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms 3M's brand.

99.     3M has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

*(Trademark Infringement Under Ohio Revised Code § 1329.65-1329.66 and Ohio Common Law)*
*(Infringement of Registered 3M Marks)*

100.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 - 99 of the Complaint as though set forth fully herein, including but not limited to the allegations in 3M's First Claim for Relief.

101.     3M is the exclusive owner of each of registered 3M Marks.

102.     3M has the exclusive right to use each of the 3M Marks in United States commerce for, *inter alia*, advertising, promoting, offering for sale, and selling 3M's 3M-brand N95 respirators.

103.     Defendant is using the 3M Marks in commerce to advertise, promote, offer for sale, and sell 3M-branded N95 respirators, including, for example, on its website by listing the products that Defendant purportedly has available for sale.

104.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendant is 3M, and/or whether Defendant is a licensee, authorized distributor, and/or affiliate of 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

105.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue cause, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products are affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

106.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products originate with, and/or are sponsored or approved by, and/or offered under a license from, 3M or vice versa.

107.     3M has not consented to the use of its famous 3M Marks by Defendant.

108.     Based on 3M's longstanding and continuous use of its 3M Marks in United States commerce, as well as the registration of the 3M Marks, Defendant had actual and constructive knowledge of 3M's superior rights in and to the 3M Marks when Defendant began using the 3M Marks as part its bad-faith scheme to confuse and deceive consumers, as alleged, herein.

109.     Defendant adopted and used the 3M Marks in furtherance of Defendant's willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

110.     Defendant has made, and will continue to make, substantial profits and gain from its unauthorized use of the 3M Marks, to which Defendant is not entitled at law or in equity.

111.     Defendant's acts and conduct complained of herein constitute trademark infringement in violation of O.R.C. § 1329.65 and Ohio common law.

112.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct invites public criticism of the manner in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and creates confusion about 3M's role in the marketplace for masks that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's unlawful conduct imminently and irreparably harms 3M's brand.

## SIXTH CLAIM FOR RELIEF

*(False Advertising and Deceptive Trade Practices, Ohio Revised Code §§ 4165 et seq.)*
*(False Advertising of and Deceptive Trade Practices Related to 3M-branded Products)*

113.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 112 of the Complaint as though set forth fully herein, including but not limited to its Fourth Claim for Relief.

114.    As alleged herein, Defendant has engaged in and continue to engage in violations of Ohio Revised Code § 4165.02 by making or disseminating untrue or misleading statements, with the intent to induce the purchase of 3M-branded N95 respirators, when Defendant knew or by the exercise of reasonable care should have known the statements were untrue, misleading, and likely to deceive the reasonable consumer and the public.

115.    Defendant's and Defendant's agents' statements and use of 3M Marks deceived or tended to deceive consumers, particularly those in the healthcare profession.

116.    The statements and use of 3M Marks were material in that they were likely to influence the deceived consumer's purchasing decisions.

117.    The statements and use of 3M Marks were introduced into interstate commerce via Defendant's sales agents and Defendant's website. ; and (5) there is some causal link between the challenged statements and harm to 3M.

118.    Had Defendant truthfully advertised that it was not authorized to sell 3M-branded products, consumers would not have purchased the products or would have purchased a different product from another distributor.

119.    This false and misleading advertising and offering for sale of 3M-branded products by Defendant presents a continuing threat to consumers, as such conduct is ongoing to this day.

120.    As a direct and proximate result of the aforementioned acts and omissions by Defendant, Defendant received and continue to hold monies rightfully belonging to 3M.

121.    3M is entitled to injunctive relief and monetary damages pursuant to O.R.C. § 4165.03.

## PRAYER FOR RELIEF

**WHEREFORE**, based on Defendant's conduct complained of, herein, 3M asks that this Court:

A.      To enter an Order, finding in 3M's favor on each Claim for Relief asserted herein;

B.      Pursuant to 15 U.S.C. § 1116, the Ohio Revised Code, and Ohio common law:

1.      Preliminarily and permanently enjoining Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from using the 3M Marks (or any other mark(s) confusingly similar thereto) for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, 3M's 3M-brand N95 respirator Marks;

2.      Preliminarily and permanently enjoining Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from falsely representing itself as being a distributor, authorized retailer, and/or licensee of 3M and/or any of 3M's products (including, without limitation, 3M's 3M-brand N95 respirator) and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; and

3.      Ordering Defendant to file with the Court and serve upon 3M's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.

C.      Pursuant to 15 U.S.C. § 1117:

1.      Order Defendant to provide 3M with a full accounting of all manufacture, distribution and sale of products under the 3M Marks (including, without limitation, 3M's 3M-brand N95 respirators), as well as all profits derived therefrom;

2.      Order Defendant to pay to 3M—so as to be donated charitably pursuant to subpart G, infra—all of Defendant's profits derived from the sale of infringing goods offered under the 3M Marks (including, without limitation, 3M's 3M-brand N95 respirators);

3.      Award 3M treble actual damages—so as to be donated charitably pursuant to subpart G, infra—in connection with Defendant's infringement of the 3M Marks;

4.      Find that Defendant's acts and conduct complained of herein render this case "exceptional"; and

5.      Award 3M—so as to be donated charitably pursuant to subpart G, infra—its costs and reasonable attorneys' fees incurred in this matter;

D.      Pursuant to 15 U.S.C. § 1118, order the destruction of all unauthorized goods and materials within the possession, custody, and control of Defendant and Defendant's client that bear, feature, and/or contain any copy or colorable imitation of 3M's 3M Marks;

E.      Award 3M pre-judgment and post-judgment interest against Defendant;

F.      Award 3M such other relief that the Court deems just and equitable; and

G.      Requiring that all monetary payments awarded to 3M be donated to a COVID-19 charitable organization(s)/cause(s) of 3M's choosing.

Respectfully submitted,

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
William D. Kloss Jr. (0040854)
Kara M. Mundy (0091146)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
(T)      614-464-5669
(F)      614-719-4709
(E)      rdschuster@vorys.com
          wdklossjr@vorys.com
          kmmundy@vorys.com

## <u>JURY DEMAND</u>

Plaintiff requests a trial by jury on all issues so triable.

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
William D. Kloss Jr. (0040854)
Kara M. Mundy (0091146)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
(T)      614-464-5669
(F)      614-719-4709
(E)      rdschuster@vorys.com
         wdklossjr@vorys.com
         kmmundy@vorys.com
